UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

VERMONTERS FOR A CLEAN                    :
ENVIRONMENT, INC., JUSTIN LINDHOLM,   :
ANNETTE SMITH, JOHN DAVID GEERY,      :
THOMAS E. SHEA, GEORGE S. HALFORD,    :
KATHY HALFORD, and TYLER RESCH,       :
                                                           :
        Plaintiffs,                                      :
                                                           :
        v.                                                :          File No. 1:12-CV-73
                                                           :
COLLEEN MADRID, Forest Supervisor        :
of the Green Mountain National Forest,        :
BOB BAYER, Project Coordinator of the       :
Deerfield Wind Project, Manchester District,  :
and CHARLES L. MYERS, Regional Forester :
of the Eastern Region, in their official capacities :
as employees of the U.S.D.A. Forest Service,  :
                                                           :
        Defendants,                                    :
                                                           :
DEERFIELD WIND, LLC,                         :
                                                           :
        Intervenor Defendant.                       :
_____ :

MEMORANDUM AND ORDER
(Docs. 78, 80, 82)

I.      Introduction

        Plaintiff Vermonters for a Clean Environment, Inc., along with individual plaintiffs,[1]

(collectively, Plaintiffs) commenced this action under the Administrative Procedure Act in

April 2012, raising claims under the National Environmental Policy Act and the Wilderness

Act.  (Doc. 1.)  Plaintiffs oppose the United States Department of Agriculture Forest Service

_____

        [1] John David Geery, George S. Halford, Kathy Halford, Justin Lindholm, Thomas E.
Shea, Annette Smith -- all members of Vermonters for a Clean Environment -- and Tyler Resch.

(the "Forest Service") decision to issue a special use permit to Deerfield Wind, LLC for the occupancy and use of an area of the Green Mountain National Forest in southern Vermont near the George D. Aiken Wilderness (Aiken or "Aiken Wilderness") where Deerfield Wind plans to construct a wind farm.  They seek an injunction prohibiting the Forest Service from issuing a special use permit to Deerfield Wind, LLC or a remand to the Forest Service for further environmental study.  (Doc. 71 (Am. Compl.).)

In November 2013, Plaintiffs filed an amended motion for summary judgment.[2] (Doc. 78.)  Defendants Colleen Madrid, Forest Supervisor of the Green Mountain National Forest, Bob Bayer, Project Coordinator of the Deerfield Wind Project, and Kathleen Atkinson, Regional Forester of the Eastern Region, in their capacities as employees of the Forest Service (collectively, Defendants), oppose the motion and have filed a cross-motion for judgment. (Doc. 80.)  Intervenor-Defendant Deerfield Wind, LLC has also filed a cross-motion for judgment on the administrative record.  (Doc. 82.)  The motions are fully briefed and the Court heard oral argument on July 23, 2014.  Because the Forest Service's decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), the Court denies Plaintiffs' motion, grants Defendants' motion, and denies as moot Intervenor-Defendant's motion.

II.    Background

Plaintiffs challenge the Forest Service Record of Decision (ROD) authorizing issuance of a special use permit for use of the Green Mountain National Forest (GMNF) for the installation of a utility-scale wind turbine facility.  Deerfield Wind, LLC originally submitted a proposal for

---

[2] The Court construes the motion as a motion for judgment on the administrative record.

land use authorization to construct and operate a wind energy facility consisting of twenty to thirty wind turbine generators on GMNF land in March 2004.  As required, Deerfield Wind also submitted an application to the Vermont Public Service Board (PSB).  The project was refined and Deerfield Wind proposed to build seventeen 2.0 megawatt (MW) wind turbine generators, seven to be placed on the east side of Route 8 -- on the same ridgeline as an existing wind facility in Searsburg[3] -- and ten on a separate ridgeline on the west side of Route 8 (the "proposed action" or "proposed project").

The Forest Service completed a draft environmental impact statement (EIS) in September 2008, a supplemental draft EIS in December 2010, and a Final EIS (FEIS) (Administrative Record (AR) 03C.00490-03C.00985[4]) and the ROD (AR 03D.00001-03D.00071) in January 2012.  Forest Service Supervisor Colleen Madrid's ROD approved an alternative to the proposed project consisting of fifteen turbines, seven on the ridgeline east of Route 8 and eight on the ridgeline west of Route 8.  Following the ROD, the Forest Service issued supplemental information reports (SIR) on night lighting of the wind turbine towers (AR 03D.00089-03D.00091 (SIR (April 2012))), bat mortality estimates caused by white-nose syndrome (AR 03D.00108-03D.00111(SIR (June 2012))), and turbine blade length (AR 18F.00061-18F.00090 (SIR (July 2013))).

Plaintiffs seek wide-ranging declaratory and injunctive relief, requesting the Court permanently enjoin construction of the project and prohibit the Forest Service from issuing a

---

[3] The existing Searsburg facility consists of eleven 198-foot wind turbine generators, in place since 1997, with a combined electric generating capacity of six megawatts.  FEIS at 10, 12.

[4] The appendices to the FEIS are in the Administrative Record beginning at 03C.00001.

special use permit or, in the alternative, to enjoin construction of the project and prohibit the

Forest Service from issuing a special use permit until further environmental study upon remand

to the Forest Service.  Plaintiffs contend the Forest Service has violated the National

Environmental Policy Act and the Wilderness Act.  The Court considers Plaintiffs' multiple

arguments below.

III.    <u>Standard of Review</u>

Because the National Environmental Policy Act (NEPA) and the Wilderness Act do not

provide for a private right of action, the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-

706, provides for judicial review of challenges to final agency action.  <u>Brodsky v. U.S. Nuclear</u>

<u>Regulatory Comm'n</u>, 704 F.3d 113, 119 (2d Cir. 2013) (NEPA); <u>Wyoming v. U.S. Dep't of</u>

<u>Agric.</u>, 661 F.3d 1209, 1226 (10th Cir. 2011) (Wilderness Act).  Under the APA, the Court may

set aside an agency's decision only if it is "found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law, . . . [or] without observance of procedure

required by law."  5 U.S.C. § 706(2)(A), (D).  Under this deferential standard of review, the

Court "cannot substitute [its] judgment for that of the agency."  <u>Natural Res. Def. Council v.</u>

<u>FAA</u>, 564 F.3d 549, 555 (2d Cir. 2009).  Nevertheless, the Court's "inquiry must be searching

and careful."  <u>Id.</u> (internal quotation marks and citations omitted).  The agency must have

"examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," <u>Motor</u>

<u>Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983), and

its decision must reveal a "rational connection between the facts found and the choice made."  <u>Id.</u>

(internal quotation marks and citation omitted).  Plaintiffs bear the burden of showing that the

agency action was arbitrary or capricious.  <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 412 (1976).

4

"Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision."  Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997) (citing Fl. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1973)).  The Court previously declined Plaintiffs' invitation to consider extra-record materials.  See Doc. 44.  Accordingly, the scope of the evidence upon which the pending motions will be decided is the administrative record (AR) compiled by the agency.

IV.   Discussion

   A.   NEPA

The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347, a procedural statute, is designed to "encourage productive and enjoyable harmony between man and his environment . . . [and to] prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  It requires an agency prepare an environmental impact statement before authorizing action "significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS must "provide full and fair discussion of significant environmental impacts and . . . inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1; see 42 U.S.C. § 4332(2)(C).  The "human environment" encompasses "aesthetic, historic, cultural, [and] economic" considerations in addition to "ecological" concerns.  40 C.F.R. § 1508.8(b).

NEPA mandates a process rather than a particular result:  "[It] does not command an agency to favor any particular course of action, but rather requires the agency to withhold its decision to proceed with an action until it has taken a 'hard look' at the environmental

consequences." <u>Stewart Park & Reserve Coal., Inc. v. Slater</u>, 352 F.3d 545, 557 (2d Cir. 2003).

NEPA does not constrain an agency from deciding "other values outweigh [] environmental

costs" so long as "the adverse environmental effects of the proposed action are adequately

identified and evaluated." <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350

(1989). "The court's role is to ensure that NEPA's procedural requirements have been satisfied,

not to 'interject itself within the area of discretion of the executive as to the choice of the action

to be taken.'" <u>Fund for Animals v. Kempthorne</u>, 538 F.3d 124, 137 (2d Cir. 2008) (quoting

<u>Kleppe</u>, 427 U.S. at 410 n.21). Thus, the Court's review must "focus[] primarily on the

procedural regularity of the decision, rather than on its substance." <u>Brodsky</u>, 704 F.3d at 118-19

(internal quotation marks and citation omitted). An EIS is not "inadequate if the agency has

made an adequate compilation of relevant information, has analyzed it reasonably, has not

ignored pertinent information, and has made disclosures to the public." <u>Sierra Club v. U.S.</u>

<u>Army Corps of Eng'rs</u>, 701 F.2d 1011, 1029 (2d Cir. 1983).

Plaintiffs argue the Forest Service "has failed to study adequately or fully disclose the

harm to the environment the project would cause." (Doc. 78-1 at 1.) They raise five specific

claims alleging Defendants violated NEPA, including: (1) bias and conflict of interest;

(2) impacts on the George D. Aiken Wilderness; (3) purpose, need and range of alternatives;

(4) blasting impacts; and (5) impacts on bats. <u>See</u> Am. Compl. (Counts 2-6).

### 1.     Bias and Conflict of Interest

Plaintiffs argue Defendants violated 40 C.F.R. § 1506.5(c) by selecting John Hecklau

of EDR Companies to draft the EIS because of his concurrent work for the parent company of

Deerfield Wind, LLC and because the developer paid for his services. (Am. Compl. at 16-17;

Doc. 78-1 at 25-28; Doc. 83 at 26-30.)  Defendants disagree.  (Doc. 80-1 at 54-60.)  Section

1506.5(c) provides an EIS "prepared pursuant to the requirements of NEPA shall be prepared

directly by or by a contractor selected by the lead agency."  40 C.F.R. § 1506.5(c).  EDR

Companies was selected by the Forest Service -- the lead agency -- to prepare the EIS.  AR

01A.00077.  The regulation further states "the intent" is:

> that the contractor be chosen solely by the lead agency . . . to avoid any conflict of
> interest.  Contractors shall execute a disclosure statement prepared by the lead
> agency . . . specifying that they have no financial or other interest in the outcome
> of the project.  If the document is prepared by contract, the responsible Federal
> official shall furnish guidance and participate in the preparation and shall
> independently evaluate the statement prior to its approval and take responsibility
> for its scope and contents.

40 C.F.R. § 1506.5(c).  Section 1506.5(a) expressly contemplates that an agency may "use the

information submitted by the applicant" in an EIS so long as the agency independently evaluates

and is responsible for the accuracy of the information.  40 C.F.R. § 1506.5(a).  The regulation

specifically states it is intended "that acceptable work not be redone, but that it be verified by

the agency."[5]  Id.

    The ultimate question for a court determining if a requirement of 40 C.F.R. § 1506.5(c)

has been breached is "whether the alleged breach compromised the objectivity and integrity of

the NEPA process."  Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.,

153 F.3d 1122, 1129 (10th Cir. 1998) (internal quotation marks and citation omitted).  Even

where a conflict of interest exists and is known to an agency, an EIS may be upheld if the agency

provided oversight to the EIS process.  Id.

---

[5] The regulations also state:  "[I]t is the [CEQ's] intention that any trivial violation of
these regulations not give rise to any independent cause of action."  40 C.F.R. § 1500.3.  CEQ is
the Council on Environmental Quality.

Whether a contractor has a conflict of interest or not rests on the definition of "financial or other interest" in §1506.5(c). Ass'ns Working for Aurora's Residential Env't, 153 F.3d at 1127.  The Council on Environmental Quality (CEQ) has "instructed that, absent an agreement to perform construction on the proposed project or actual ownership of the construction site, it is 'doubtful that an inherent conflict of interest will exist' unless 'the contract for EIS preparation . . . contain[s] . . . incentive clauses or guarantees of any future work on the project.'"  Id. (citing Guidance Regarding NEPA Regulations, 48 Fed. Reg. 34,263, 34,266 (Council on Envtl. Quality 1983)).

Plaintiffs have not alleged any agreement to perform construction, actual ownership of the construction site, or incentive clauses or guarantees of future work on the project. Accordingly, the Court finds neither EDR Companies nor Mr. Hecklau had an inherent conflict of interest.

Notwithstanding the lack of a conflict of interest, the Forest Service, as required by 40 C.F.R. § 1506.5(a), independently evaluated and took responsibility for the accuracy of the information "developed and prepared" by EDR Companies and Mr. Hecklau.  FEIS 450-52. Therefore, even if EDR Companies or Mr. Hecklau had a conflict of interest, the Forest Service oversaw their work to a sufficient degree that a conflict would not require invalidation of the EIS because the objectivity and integrity of the NEPA process was not compromised.[6]  Ass'ns

---

[6] The same can be said of the other consultants' work that Plaintiffs assert was plagiarized in the FEIS.  See Doc. 78-1 at 21-23, 26-27; Doc. 83 at 28-30.  As noted, section 1506.5(a) specifically states the intent "that acceptable work not be redone, but that it be verified by the agency."  40 C.F.R. § 1506.5(a)

Working for Aurora's Residential Env't, 153 F.3d at 1129.  Count Two of Plaintiffs' Amended

Complaint alleging a violation of NEPA based on bias and conflict of interest is dismissed.

2.  Impacts on the George D. Aiken Wilderness

Plaintiffs argue the Forest Service violated NEPA by failing to perform an adequate

analysis of impacts to the George D. Aiken Wilderness.  (Am. Compl. at 17-19; Doc. 78-1 at 23-

25.)  Specifically, Plaintiffs fault the Forest Service's consideration of visual and sound impacts

of the Deerfield Wind project on the nearby Aiken Wilderness.  Defendants characterize

Plaintiffs' argument as suggesting that a violation of the Wilderness Act[7] demonstrates a

violation of NEPA.  (Doc. 80-1 at 51.)  As noted, NEPA requires the Court ascertain whether

NEPA's procedural requirements have been satisfied.  Here, where an EIS has been prepared, the

Court must determine whether the Forest Service has taken the requisite hard look at the issues of

visual and sound impacts upon the Aiken Wilderness.

The Record of Decision and FEIS demonstrate noise and visual resource impacts were

considered.  See ROD at 21-22, 24; FEIS at 27, 96-151.  The FEIS acknowledges the concern

that the project would adversely affect visual resources as a significant issue and notes the

concern the project would adversely affect solitude.  The ROD specifically discusses views of the

project from the Aiken Wilderness.  ROD at 22.  The FEIS includes the Aiken Wilderness in the

definition of the "affected environment" studied for noise impacts, including direct and indirect

impacts of construction and operation of the project.  FEIS at 96.  An additional appendix was

added in response to public comments addressing potential health effects of turbine noise.  Id.

_____

[7] Plaintiffs' claim that the Forest Service violated the Wilderness Act is addressed below.
See infra Part IV.B.

at 103 & App. K.  The Forest Service identified and evaluated visual and sound impacts upon the

Aiken Wilderness, concluding "despite concerns, I am confident that the design criteria and

mitigation will minimize visual impacts," ROD at 22, and, with regard to noise and other

concerns, "I am confident that the application of the design criteria, mitigation measures, and

conditions of the CPG [certificate of public good] will minimize or eliminate unacceptable

adverse impacts," ROD at 24, and decided to authorize the project in the reduced west

configuration.  See Robertson, 490 U.S. at 350 (noting NEPA does not constrain an agency

decision that "other values outweigh [] environmental costs" if adverse environmental effects are

adequately identified and evaluated).

 The Court determines the Forest Service's analysis of the visual and sound impacts of the

Deerfield Wind project on the nearby Aiken Wilderness was sufficient under NEPA.  Count

Three of Plaintiffs' Amended Complaint alleging a violation of NEPA based on impacts upon the

George D. Aiken Wilderness is dismissed.

3. Purpose and Need Statement and Range of Alternatives

 Plaintiffs argue the Forest Service violated NEPA in the drafting of the purpose and need

statement and, consequently, in the range of alternatives studied.  (Am. Compl. at 19-20;

Doc. 78-1 at 28-41; Doc. 83 at 1-7 (range of alternatives).)  Plaintiffs argue the purpose and need

statement is "impermissibly narrow" because it "defin[es] the agency's objective as a

consideration of 'this site-specific wind energy development proposal,'" (Doc. 78-1 at 28-29) and

led to the agency considering an unreasonably narrow range of alternatives, id. at 33.  Plaintiffs

specifically request the Court require the Forest Service prepare a revised impact statement

evaluating Site 35 for development.  Id. at 37.  Site 35 is a nearby site within the GMNF

10

identified in the Forest Plan as a site "potentially suitable for potential future wind energy development."  FEIS at 29; see also id. at 34-35.  Defendants respond the purpose and need statement is not impermissibly narrow, a reasonable range of alternatives was considered, and the decision not to consider Site 35 was not arbitrary or capricious.  (Doc. 80-1 at 7-18.)

NEPA requires an EIS "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives included in the proposed action."  40 C.F.R. § 1502.13.  Plaintiffs quote the District of Columbia Circuit Court for the proposition that "an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality."  Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C. Cir. 1991) (Thomas, J.).  The next sentence, however, states:  "Nor may an agency frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish those goals and the project would collapse under the weight of the possibilities."  Id.  When asked to review a specific plan, an "agency should take into account the needs and goals of the parties involved in the application."  Id.  An agency's purpose and need statement -- by which it defines its objectives -- is sufficient under NEPA and will be upheld by a Court if the statement is reasonable.  Id.  Among other objectives, see ROD at 11-13, the Forest Service purpose and need statement listed "independently evaluat[ing]" the applicant's "site specific wind energy development proposal" to determine "consisten[cy] with applicable federal law, policy, and the Forest Plan," id. at 11.  Given that the Forest Service was presented with a specific proposal, the Court finds it reasonable that the purpose and need statement took into account the proposal of

the applicant, which included a specific site.  The Forest Service's purpose and need statement is not in violation of NEPA.

NEPA requires an agency include a detailed statement on alternatives to the proposed action in the EIS.  42 U.S.C. § 4332(2)(C)(iii).  The agency must "objectively evaluate all reasonable alternatives" and "briefly discuss the reasons" for eliminating an alternative from detailed study.  42 C.F.R. § 1502.14(a); see also Busey, 938 F.2d at 195 (NEPA "oblige[s] agencies to discuss only alternatives that are feasible or . . . reasonable").  "It is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion."  Friends of Ompompanoosuc v. FERC, 968 F.2d 1549, 1558 (2d Cir. 1992) (citing Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 551-52 (1978)).  Plaintiffs take issue with the breadth of alternatives considered, specifically arguing the Forest Service violated NEPA by considering only one viable action alternative, eliminating Site 35 from consideration, and failing to consider alternatives that included non-Green Mountain National Forest land.  (Doc. 78-1 at 33-39.)  The Court will consider each of these arguments in turn.

Plaintiffs assert only two of the four alternatives considered in detail were actually viable: the no-action alternative and alternative two, which was selected.  The alternatives discussed in the EIS consisted of no action ("no action" or "alternative one"), reduced turbines on the western project site ridgeline from ten to eight for a total of fifteen turbines ("reduced west" or "alternative two"), and turbines on the eastern project site ridgeline only for a total of seven turbines ("east-side only" or "alternative three").  FEIS at 35.  Because the applicant would not build the east-side only alternative three and the PSB rejected the proposed action, Plaintiffs

argue only the selected reduced west alternative and no action remained viable.  Plaintiffs'

argument assumes the Forest Service had to select an alternative that could be developed or none

at all.  They cite no authority supporting that contention and the ROD specifically states, in

discussing the east side only option, "[e]ven if the current Applicant would not consider

constructing this smaller facility, other industry proponents . . . could become interested in

building this at a later date."  ROD at 26.  This statement confirms that the Forest Service

considered alternative three a viable alternative notwithstanding Deerfield Wind's position.  The

Court finds the Forest Service considered more than one "viable" action alternative[8] and rejects

Plaintiffs' argument to the contrary.

    Plaintiffs argue the Forest Service's failure to include Site 35 as an alternative was

arbitrary and capricious.  The FEIS describes the process undertaken to develop the final range of

evaluated alternatives.  FEIS at 29-35.  The Forest Service concluded it would not be reasonable

to consider Site 35 as an alternative because of "very similar characteristics" to the proposed

action that would render detailed analysis "duplicative within the existing range of alternatives."

FEIS at 35.  Plaintiffs assert the "critical" difference between Site 35 and the other alternatives is

distance from the Aiken Wilderness, describing it as "much farther away."  (Doc. 78-1 at 36.)

The distance from Site 35 to the Aiken is less than two miles further away than the alternative

selected.  In determining duplicity, the Forest Service considered whether Site 35 "clearly had the

potential to result in substantially less overall environmental, economic, and social impacts than

---

[8] The Court notes the PSB issued a final certificate of public good authorizing fifteen turbines in July 2009.  See FEIS at 3.  The Forest Service had been considering the proposed action -- consisting of seventeen turbines -- since 2004 and issued the DEIS in September 2008. The Court finds including the proposed action in the FEIS was not arbitrary or capricious.

what would be anticipated by the proposed action." FEIS App. I at 1. In a thorough discussion, the Forest Service identified no substantial differences in potential impacts between Site 35 and the proposed action. FEIS App. I at 11-15. See also Natural Res. Def. Council, 564 F.3d at 557-58 (holding agency reasonably exercised discretion to carry forward an alternative that would displace 49 homes instead of a similar alternative that would displace 22 homes). Accordingly, the agency complied with NEPA's procedural requirement to "briefly discuss" the reasons for eliminating the potential alternative and exercised its discretion to subject the proposed action on nearby land to detailed analysis. See 40 C.F.R. § 1502.14(a). The Court finds the Forest Service's decision not to consider Site 35 as an alternative was not an abuse of discretion. See Friends of Ompompanoosuc, 968 F.2d at 1558.

Plaintiffs also argue the Forest Service's failure to include any non-Green Mountain National Forest land as an alternative was arbitrary and capricious. The Forest Service considered specific private land tracts identified by the public but declined to pursue detailed analysis of any such land as a possible alternative because that "would be beyond the scope" of the environmental impact statement. FEIS at 30-31. Because the range of alternatives that must be discussed is a matter within an agency's discretion, and the Forest Service considered and declined to include private land, the Court finds the Forest Service did not abuse its discretion. See 40 C.F.R. § 1502.14(a); Friends of Ompompanoosuc, 968 F.2d at 1558. The Court finds the range of alternatives the Forest Service subjected to detailed analysis was not arbitrary or capricious and declines to order the Forest Service to prepare a revised impact statement evaluating Site 35 for development.

14

Lastly, Plaintiffs assert the Forest Service failed to justify its non-selection of the east-side only alternative three in violation of NEPA.  The information presented on each alternative in the FEIS was sufficient to permit a reasoned decision among the alternatives presented.  The ROD adequately describes the Forest Service selection of alternative two -- the reduced west configuration consisting of fifteen turbines -- as well as the non-selection of alternative three.  ROD at 1, 26-28.  Plaintiffs point out the Forest Service's finding that alternative three was the environmentally preferable alternative and assert it was not chosen because Deerfield Wind stated it would not consider developing it.  (Doc. 78-1 at 40.)  Alternative three, as found above, was a viable alternative and the Forest Service's non-selection of it was sufficiently explained in the ROD.  Though the Forest Service determined alternative three to be the environmentally preferred project, ROD at 28, it concluded that alternative three would "provide limited positive benefits" because it would not provide "as meaningful of a contribution toward producing emissions free energy."  ROD at 27.

Accordingly, the Forest Service selected alternative two notwithstanding greater environmental impacts because it would "provide more robust beneficial impacts to address climate change issues."  ROD at 28.  NEPA does not require the environmentally preferred alternative be chosen, only that "the agency considered the environmental consequences of its proposed actions."  Sierra Club v. U.S. Army Corps of Eng'rs, 772 F.2d 1043, 1050 (2d Cir. 1985) ("An agency . . . does not have to accord environmental concerns any more weight in the decisionmaking process than other appropriate concerns.").  The FEIS and ROD demonstrate the Forest Service considered the environmental consequences of the alternatives and explained the

rationale for not selecting alternative three.  Plaintiffs' assertion that the Forest Service failed to justify its non-selection of alternative three is rejected.

The drafting of the purpose and need statement and range of alternatives studied were not legally inadequate.  Count Four of Plaintiffs' Amended Complaint alleging a violation of NEPA based on inadequate purpose and need and range of alternatives is dismissed.

### 4.   Blasting Impacts

Plaintiffs allege the Forest Service violated NEPA by failing to properly analyze blasting impacts.  (Am. Compl. at 21; Doc. 78-1 at 53-58; Doc. 83 at 16-18.)  They assert the Forest Service failed to take a hard look at blasting impacts because it did not study the extent and specific locations of adverse impacts associated with blasting, and instead required a blasting plan be developed in the future.  Defendants respond the Forest Service's analysis of blasting meets all NEPA requirements.  (Doc. 80-1 at 33-36.)

As noted, an EIS "shall provide a full and fair discussion of significant environmental impacts."  40 C.F.R. § 1502.1.  An EIS, however, "shall be kept concise [and shall be no longer than absolutely necessary to comply with NEPA and [the] regulations]," and impacts "shall be discussed in proportion to their significance."  40 C.F.R. § 1502.2(b)-(c).

Plaintiffs contend the Eighth Circuit's Mid States Coalition for Progress v. Surface Transportation Board, 345 F.3d 520 (8th Cir. 2003), decision supports their position because it holds:  "'[w]hen the nature of the [adverse] effect is reasonably foreseeable but its extent is not . . . the agency may not simply ignore the effect.'"  (Doc. 78-1 at 56 (quoting 345 F.3d at 549).) Plaintiffs assert the Forest Service ignored the effects of blasting in violation of NEPA.  Id.  The Mid States court, however, in analyzing an agency's treatment of increased coal consumption,

found the agency "completely ignored the effects" of the issue in the FEIS, instead relying on the

Clean Air Act Amendments to assume the conclusion "emissions will definitely fall to the

mandated level."  345 F.3d at 550.  The Forest Service's evaluation of the effects of blasting are

distinguishable.  It included blasting in the FEIS and ROD.  Blasting was addressed specifically

in the discussion of impacts to soil resources by the proposed action and alternatives, FEIS at

79-81, and throughout the FEIS in discussions of impacts of soil displacement, id. at 77-78,

construction/construction noise, id. at 104-05, 427-28, and groundwater, id. at 186-87, as well as

in discussion of cumulative impacts, id. at 117-18.  Finally, the ROD details the requirements for

the blasting plan that will be developed as part of the design criteria/mitigation measures to

"avoid or minimize potential environmental impacts."  ROD at Attachment 1-1, 1-3.  This is not

a case where an issue was "completely ignored" by the agency.  Blasting was not identified as a

stand-alone significant issue, see ROD at 14, but, as discussed, was analyzed as applicable in the

discussions of other adverse impacts.

Plaintiffs state the FEIS "offers no scientific basis for the bald assurances that a

contractor's blasting plan would avoid damages."  (Doc. 78-1 at 56.)  NEPA does not require any

such assurance.  The Forest Service discussed the potential impacts blasting could cause -- soil

displacement and mud slides, for example, FEIS at 77 -- and will require a blasting plan as a

mitigation measure to minimize potential impacts, ROD at Attachment 1-1, 1-3.  The Forest

Service fulfilled its obligation under NEPA to consider the environmental consequences of

blasting.  See Sierra Club, 772 F.2d at 1050 (noting under NEPA "a reviewing court need only

find that the agency considered the environmental consequences of its proposed actions;" the

17

"agency . . . does not have to accord environmental concerns any more weight in the decisionmaking process than other appropriate concerns").

The Court finds the Forest Service adequately considered and disclosed the environmental impact of potential blasting.  Count Five of Plaintiffs' Amended Complaint alleging a violation of NEPA based on failure to properly study blasting impacts is dismissed.

5.     Impacts on Bats

Plaintiffs allege the Forest Service violated NEPA by failing to conduct a supplemental environmental impact statement following the release of an increased estimate of bat deaths from white-nose syndrome.  (Am. Compl. at 21-23; Doc. 78-1 at 41-47; Doc. 83 at 7-11.)  Plaintiffs seek an order requiring the Forest Service to conduct further study of the potential impacts to bats because "each resulting death would be that much more devastating to the populations as a whole."  (Doc. 78-1 at 48.)  In their motion, they further assert the Forest Service should reexamine the FEIS estimate of bat mortality based on subsequent data from the Sheffield, Vermont wind project.  (Doc. 78-1 at 47-50; Doc. 83 at 13-15.)  Lastly, Plaintiffs assert the Forest Service's initial analysis of bat mortality contained in the FEIS was inadequate because it failed to use methods other than acoustic testing to identify bat species present in the area. (Doc. 78-1 at 51-53.)  Defendants respond the Forest Service's analysis of bat fatalities satisfies NEPA.  (Doc. 80-1 at 19-33.)  Further, they assert Plaintiffs have not met their burden to show a supplemental EIS is required.  Id. at 23-33.

An agency is required to prepare a supplement to an FEIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  This requirement, however, is limited:

"[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized," because to "require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 373 (1989).  An agency decision not to prepare a supplement is given deference provided the decision is not arbitrary or capricious.  Id. at 377.

The FEIS was issued in December 2011 and the ROD on January 3, 2012.  Plaintiffs assert a January 17, 2012 United States Fish & Wildlife Service (USFWS) new estimate of bat mortality from white-nose syndrome represents a changed circumstance requiring "further review by the agency."  (Doc. 78-1 at 44.)  On June 8, 2012, Forest Supervisor Madrid issued a Supplemental Information Report (SIR) for the Deerfield Wind Project FEIS and ROD reviewing new information regarding bat mortality estimates caused by white-nose syndrome.  The SIR noted the 2009 estimate the FEIS cited estimated total mortality from white-nose syndrome (WNS) in the Northeast exceeded one million and acknowledged the new USFWS estimate of 5.7 to 6.7 million bat deaths "across the entire WNS-affected portions of North America." SIR (June 2012) at 2.  Madrid "carefully considered the new information" and found "no change in the effects specific to bats as they have been documented in the Deerfield Wind Project FEIS" concluding "the existing environmental analysis is adequate to support" the ROD and "a correction, supplement, or revision to the FEIS is not necessary."  SIR (June 2012) at 4.  The FEIS recognized bat populations "are experiencing unprecedented mortality" due to WNS, FEIS at 295, and considered and analyzed the potential impacts to bats of the proposed project and alternatives through that lens.  See FEIS at 295-332.  The analysis was not dependent on the

19

estimated mortality figure of one million bats available in 2009.  The Forest Service, through the

SIR, acknowledged and considered the increased estimate and determined it did not render the

existing analysis of potential impacts inadequate.  In light of the thorough analysis of the

potential impacts to bats from the proposed project contained in the FEIS, and the findings of the

SIR, the Court determines the Forest Service conclusion that further study or a revised, or

supplemented, final EIS was not warranted was not an abuse of discretion, arbitrary, or

capricious.  The Court declines to order the Forest Service to prepare a revised impact statement

evaluating increased bat mortality from white-nose syndrome.

Plaintiffs also argue the Forest Service should reexamine the FEIS estimate of bat

mortality from the proposed project based on subsequent data from the Sheffield, Vermont wind

project.  The September 30, 2013 Amended Complaint does not allege the FEIS is inadequate or

must be supplemented based on the 2012 estimated data from the Sheffield project.  Nonetheless,

the Court notes Forest Supervisor Madrid considered the Sheffield data in a SIR issued July 23,

2013, reviewing new information regarding proposed changes to turbine blade length.  SIR

(July 2013).  The SIR noted the higher annual mortality per turbine in the Sheffield study as

"substantially higher than the estimate derived for the Deerfield facility in the FEIS."  SIR (July

2013) at 17.  The Forest Service considered the data, determined the one year data at Sheffield

"does not predict or imply that bat mortality would be of a similar magnitude at the proposed

Deerfield Wind Project," and concluded a supplemental EIS was not warranted.  SIR (July 2013)

at 17-18.  The Court finds this conclusion was not arbitrary or capricious.

Lastly, Plaintiffs argue the Forest Service's initial analysis of bat mortality contained in

the FEIS was inadequate because it did not determine with "any reasonable degree of certainty"

20

which bat species occupy the project area (Doc. 78-1 at 51), and "likely underestimated" the number of migratory bats that would be affected.  Id. at 52.  Plaintiffs assert the Forest Service should have used infrared imaging or other night-vision testing in addition to acoustic testing.  Id. As noted above, the FEIS contained a thorough analysis of the potential impacts to bats from the proposed project.  An agency choice of methodology is entitled to deference provided it is not arbitrary or without foundation.  Senville v. Peters, 327 F. Supp. 2d 335, 354 n.16 (D. Vt. 2004) (citing Friends of Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1130 (8th Cir. 1999)).  The Forest Service use of acoustic testing rather than other methods such as infrared to identify bat species present in the area was not an abuse of discretion.  The Court rejects Plaintiffs' argument that the Forest Service's initial analysis of bat mortality contained in the FEIS was inadequate.

Count Six of Plaintiffs' Amended Complaint alleging a violation of NEPA based on failure to properly consider impacts on bats is dismissed.

B.    Wilderness Act

The Wilderness Act, 16 U.S.C. §§ 1131-1136, requires designated wilderness areas be administered to leave them unimpaired for future use and enjoyment and to preserve their wilderness character.  The Act specifically directs an agency administering a wilderness area "shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character."  16 U.S.C. § 1133(b).  The Wilderness Act explicitly states:  "[n]othing in [the Act] shall be deemed to be in interference with the purpose for which national forests are established."  16 U.S.C. § 1133(a)(1).

While the Second Circuit has not considered the extent to which the Wilderness Act applies to limit agency action outside wilderness areas, the parties point the Court to a decision of the District Court for the District of Minnesota, Izaak Walton League of Am. v. Kimbell, 516 F. Supp. 2d 982 (D. Minn. 2007).  The Izaak Walton League court noted "a per se ban on all agency activity having some impact on the adjoining [] wilderness area would substantially impede [agency] administration of wilderness areas, and could serve to expand the wilderness boundaries beyond the area established by Congress."  Id. at 989.  An agency "must take into account the fact that, at some point, the wilderness stops and civilization begins."  Id. Accordingly, the "key question" in deciding whether agency action violates the Wilderness Act is whether that action degrades the wilderness character of a designated wilderness area.  Id. Factors to consider are:  the nature of the agency activity, the existing character of the wilderness area, and the extent to which the essential, natural characteristics of the wilderness area are changed by the agency activity.  Id.

Plaintiffs argue allowing the siting of an industrial facility so close to the George D. Aiken Wilderness would destroy or significantly degrade the wilderness characteristics of it. (Doc. 78-1 at 5-23, Doc. 83 at 18-26.)  Count One of the Amended Complaint alleges issuance of  a special use permit to Deerfield Wind, LLC and construction of the Deerfield Wind Project would violate the Wilderness Act.  See Am. Compl. (Count 1).  Plaintiffs base their argument primarily on the visual and noise impacts of the wind facility on the Aiken.  Defendants respond the Deerfield Wind Project does not violate the Wilderness Act because the effects of the project will not impermissibly degrade the wilderness characteristics of the Aiken Wilderness.  (Doc. 80-1 at 36-51.)

Congress designated the George D. Aiken Wilderness Area a wilderness area in 1984 in the Vermont Wilderness Act.  Pub. L. No. 98-322, 98 Stat. 253 (1984).  The Aiken Wilderness is approximately 5,060 acres of land in the Green Mountain National Forest, id., and is situated in the town of Woodford, approximately 1.5 miles west of the western ridge of the proposed project site at the closest point, FEIS at 112.[9]  The middle of the Aiken would be approximately three miles from the closest proposed turbine.  FEIS at 113.  Forest Supervisor Madrid concludes in the ROD "no undue adverse impacts from Project activities [are] expected to the wilderness character or to the experience of those using the wilderness resource."  ROD at 33.

As noted above, the ROD and FEIS demonstrate the Forest Service considered noise and visual resource impacts to the George D. Aiken Wilderness.  See ROD at 21-22, 24; FEIS at 27, 96-151.  The FEIS specifically discusses potential visibility of the proposed project from within and assesses the visual impacts to four general areas of the Aiken.  FEIS at 149-51.  The Forest Service notes the existing Searsburg facility turbines can be seen from many places where the proposed turbines would be seen and the turbines "would be seen at distances ranging from about 1.5 miles at the closest point to over 5 miles away from western portions of the Wilderness."  FEIS at 151.  The FEIS concludes "overall visibility, even in the winter months, would be limited."  Id.  In analyzing visual impacts of alternative two compared to the proposed action, the FEIS notes differences in views from the Aiken would be minor "since views are extremely

_____

[9] Plaintiffs quibble with this measurement, asserting "according to the FEIS, the actual distance is 'approximately 1.3 miles.'"  (Doc. 83 at 18 (quoting FEIS at 148).)  The entirety of the sentence quoted by Plaintiffs states:  "From Forest Road 74, the ridge proposed for the Western Project site is approximately 1.3 miles away at its closest point."  FEIS at 148.  Forest Road 74 is a designated snowmobile trail that hikers and snowshoers occasionally use to access the Aiken which is outside the eastern border of the Aiken.  Id. at 112, 148.

23

limited in any case." Id. at 161.  The Court finds the Forest Service analyzed the potential for

visual impacts to the Aiken and its conclusions regarding limited potential impacts to the Aiken

are not arbitrary or capricious, are in keeping with the goals of the Forest Plan, id. at 6, and will

not impermissibly degrade the wilderness characteristics of the George D. Aiken wilderness.[10]

The ROD and FEIS also address potential noise impacts of the proposed project generally

and to the Aiken Wilderness.  See ROD at 24; FEIS at 96-118.  The Forest Service provides a

"noise primer" as an appendix to the FEIS to assist the reader in understanding specialized terms

used in noise monitoring and assessment.  See FEIS App. B.  Sound is measured in decibels

(dB).  FEIS at 97.  For comparison purposes, commonly experienced sound levels include 50 dB

for a quiet office setting, 60 dB for conversational speech, 75 dB in a vehicle traveling 65 miles

per hour with the windows up, and 90 dB for a heavy truck at fifty feet.  Id.  Because sound

changes over time, it is often measured as an average.  Id.  The Forest Service includes a table

summarizing various organizations' standards or guidelines regarding noise limits which range

from 40 dB to 70 dB.  FEIS at 100 (Table 3.4-2).  The Environmental Protection Agency (EPA)

---

[10] In their motion, Plaintiffs make a passing reference to the night lighting of the turbines, asserting the "FEIS contains no discussion at all of the visual impact from within the Aiken of the seven blinking red lights on the turbines during nighttime hours."  (Doc. 78-1 at 15.)  The FEIS details night lighting of the turbines, FEIS at 14-15, and determines nighttime use of the Aiken could occur during the late fall and winter -- when views of the project are more likely -- but "camping would likely take place on flatter slopes where visibility of Project lights would be difficult."  FEIS at 151.  The FEIS notes the FAA obstruction warning lighting is "designed to be visible to aircraft but not to light up the general area;" it does not create or contribute to skyglow or interfere with star-gazing.  FEIS at 153, 159.  Additionally, the lighting will be kept to the minimum required by the FAA, FEIS at 159, and a SIR reviewing new information regarding night lighting explains new radar-activated FAA obstruction lighting technology -- resulting in no change or less environmental effects -- will replace the traditional lighting system at construction or within six months of FAA approval.  SIR (April 2012) at 1-2.  Accordingly, the Court rejects Plaintiffs' assertion that the Forest Service failed to assess the visual impact of night lighting of the project to the Aiken Wilderness.

standard sound level to "protect public health and welfare with an adequate margin of safety" is

55 dB and the World Health Organization (WHO) guideline for community noise to protect

against sleep disturbance at night is 45 dB.  Id.  The Forest Service analysis adopted a standard of

45 dB weighted average over an hour for project noise.  FEIS at 100.

　　　The FEIS specifically discusses background sound levels and noise modeling at the

closest boundary of the Aiken to the proposed project site.  FEIS at 101-03, 112-13.  The average

background noise at the closest edge of the Aiken was measured at 45 dB during the day and

39 dB at night over the time the monitoring occurred.  FEIS at 103 (Table 3.4-3).  The median

levels were determined to be 33 dB during the day and 29 dB at night, id., and over a twenty-four

hour period, the existing average sound level was 25 dB, FEIS at 112, see also FEIS Figure 3.4-3.

The existing Searsburg facility turbines and state highway Route 9 -- 2.1 miles from the center of

the Aiken -- contribute to the background noise.  FEIS at 103, 113.  The monitoring occurred

prior to snowmobile season, however, when noise levels would be expected to increase due to

snowmobile traffic on Forest Road 74.  FEIS 101, 112.

　　　Noise modeling was conducted using the maximum rated sound levels of the seventeen

proposed turbines and excluded existing forest cover to present conservative worst-case

conditions.  FEIS at 107-08.  The Forest Service determined the project-related noise from the

proposed action would be 29 dB at the boundary of the Aiken, an increase of 4 dB over the

conservative 25 dB existing sound level.  FEIS at 112.  In analyzing alternative two -- reduced

west -- the FEIS notes an increase of 7 dB in sound levels from existing conditions and for the no

action alternative, a total of 31-32 dB in project-related noise.  FEIS at 116; FEIS Figure 3.4-3.

In July 2013, the Forest Service issued a SIR reviewing new information about a proposed

25

turbine blade length change.  See AR 18F.00061-18F.00090.  The SIR reviewed updated noise modeling based on the proposed change to larger turbines on the western ridge of the project site and determined the sound level would not change at the boundary of the Aiken.  SIR (July 2013) at 7, 12.  The SIR concluded noise levels at all monitoring sites would remain below the acceptable noise standard threshold of 45 dB for the project.  SIR (July 2013) at 9.

Plaintiffs assert Forest Service authorization of the Deerfield Wind project violates the Wilderness Act because the noise impacts will degrade the wilderness characteristics of the Aiken.  They argue that if the "mechanical sound" of turbines can be heard within the wilderness, "it will no longer be a wilderness."  (Doc. 78-1 at 18.)  They also take issue with the siting of the noise monitoring station on the boundary instead of "within the Aiken Wilderness itself." (Doc. 83 at 25.)  Because the center of the Aiken Wilderness is closer to a state highway than to the proposed project site and a snowmobile trail is located near its eastern border, the Aiken is currently subject to mechanical sounds and was subject to traffic noise when the area was designated a wilderness in 1984.  As Plaintiffs note, the monitoring station was located on the eastern edge of the wilderness.  If the Forest Service had placed monitoring stations inside the Aiken, it may be in violation of the Wilderness Act's prohibition against any "structure or installation within [a wilderness] area."  See 16 U.S.C. § 1133(c).  Indeed, Plaintiffs opined § 1133(c) "almost always means that the Forest Service cannot build, or even maintain, any structure, no matter how insubstantial, within a Wilderness Area."  (Doc. 83 at 22 (citing cases).) Accordingly, the Court declines to fault the Forest Service for the siting of the monitoring stations on the edge of the Aiken.

To put the noise levels into perspective, the highest modeled total project related noise level at the boundary of the George D. Aiken Wilderness of 32 dB for the selected alternative project is approximately the median measured existing background noise at the Aiken of 33 dB. The 32 dB noise level is lower than the project standard of 45 dB and the average daytime background noise at the Aiken -- also 45 dB.  Though the type of noise may be "more constant, more frequent, or of a different quality," Izaak Walton, 516 F. Supp. 2d at 990, given the proximity of Route 9 -- and the presence of snowmobiles during the winter season -- the Court finds a noise level of 32 dB -- almost half the decibel level of a conversation -- is not degrading to the wilderness characteristics of the George D. Aiken Wilderness.

Courts have "'accept[ed] the legislative history of the [Wilderness Act] as indicating its terms should not be interpreted as a general curtailment of agency discretion in the normal day-by-day administration of the national forests.'"  Wyoming v. U.S. Dep't of Agric., 661 F.3d at 1235 n.20 (quoting Parker v. United States, 448 F.2d 793, 797 (10th Cir. 1971)).  The FEIS and ROD demonstrate the Forest Service thoroughly considered the effect of the Deerfield Wind project on the Aiken Wilderness, concluding the project would not cause undue adverse impacts and therefore would not impermissibly degrade its wilderness characteristics.  See ROD at 33. Plaintiffs have not demonstrated the Forest Service's analysis or conclusion was arbitrary or capricious.

Count One of Plaintiffs' Amended Complaint alleging a violation of the Wilderness Act based on proximity to the George D. Aiken Wilderness is dismissed.

V.      Conclusion

       For the above reasons, the Court concludes the Forest Service complied with NEPA's

procedural requirements in evaluating Deerfield Wind, LLC's proposal to construct a wind farm

in the Green Mountain National Forest and declines to interject itself within the Forest Service's

discretion "as to the choice of the action to be taken."  Kleppe, 427 U.S. at 410 n.21 (internal

citation omitted).  Defendants do not violate NEPA or the Wilderness Act in issuing the special

use permit to Deerfield Wind, LLC.  Accordingly, Plaintiffs' amended motion for summary

judgment (Doc. 78), construed as a motion for judgment, is DENIED.  Defendants' cross motion

for judgment (Doc. 80) is GRANTED.  Defendant-Intervenor's cross motion for judgment

(Doc. 82) is DENIED as moot.  Plaintiffs' amended complaint (Doc. 71) is dismissed.

       SO ORDERED.

       Dated at Brattleboro, in the District of Vermont, this 24th day of December 2014.


                                               /s/ J. Garvan Murtha
                                               Honorable J. Garvan Murtha
                                               United States District Judge

28